# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| **MICHAEL O'BRIEN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case number 4:05cv1559 RWS** |
| | ) | **TCM** |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,**[1] | ) | |
| | ) | |
| **Defendant.** | ) | |

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This is an action under 42 U.S.C. § 405(g) for judicial review of the final decision of

Michael Astrue, the Commissioner of Social Security ("Commissioner"), denying Michael

O'Brien disability insurance benefits ("DIB") under Title II of the Social Security Act ("the

Act"), 42 U.S.C. §§ 401-433. Plaintiff has filed a brief in support of his complaint; the

Commissioner has filed a brief in support of his answer. The case was referred to the

undersigned United States Magistrate Judge for a review and recommended disposition

pursuant to 28 U.S.C. § 636(b).

## Procedural History

Michael O'Brien ("Plaintiff") applied for DIB in April 2000, alleging he was disabled

by leukemia. (R. at 11, 22, 52.)[2] This application was granted. (Id.) Concluding that

---

[1]Mr. Astrue was sworn in as the Commissioner of Social Security on February 12, 2007, and is hereby substituted as defendant pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure.

[2]References to "R." are to the administrative record filed by the Commissioner.

Plaintiff's health had improved and that he was able to work, the Social Security Administration ("SSA") notified Plaintiff in October 2003 that his DIB would cease as of December. (Id. at 99-102.) Plaintiff requested reconsideration of this decision. His request was denied initially, after a hearing before a hearing officer, and after a hearing held in December 2004 before Administrative Law Judge ("ALJ") James B. Griffith. (Id. at 11-18, 20-51, 77-88.) After receiving additional medical records, the Appeals Council denied Plaintiff's request for review, effectively adopting the ALJ's decision as the final decision of the Commissioner. (Id. at 3-5.)

## Testimony Before the ALJ

Plaintiff, represented by counsel, and Michael P. Brethauer, a vocational expert ("VE"), testified at the administrative hearing.

Plaintiff testified that he was born on December 18, 1957, and was then 46 years old. (Id. at 24.) He was 6 feet 4 inches tall and weighed 280 pounds, having gained some weight because of the medication he was taking. (Id. at 23.) He was divorced and lived with his mother, daughter, age 18, and son, age 16. (Id.) He completed the tenth grade, and had never obtained a General Equivalency Degree ("GED"). (Id. at 24.)

Plaintiff last worked five years ago, as a driver and warehouse worker. (Id.) His only current source of income was DIB. (Id.)

He was originally granted DIB because of his chronic myelocytic leukemia ("CML"). (Id. at 27.) His white blood counts had improved significantly; however, he still suffered from fatigue as a result of the CML. (Id. at 27-28.) He napped every day for approximately

one hour, and spent the majority of his waking hours sitting in a recliner.  (Id. at 28.)  He slept for six to seven hours a night.  (Id.)  He currently had severe pain in his lower and middle back.  (Id.)  The former was every day, although it varied in intensity.  (Id.)  He had had several spinal blocks to alleviate the pain; they had not worked.  (Id. at 29.)  He also had a transcutaneous electrical nerve stimulation ("TENS") unit.  (Id. at 30.)  It provided a "certain degree" of relief.  (Id.)  Also, medicine helped a little.  (Id.)  He tried to do five minutes of exercise daily.  (Id. at 31.)  Neither it nor the pain management classes he had taken had helped.  (Id.)  The pain in his middle back also occurred daily, for all-day.  (Id.)  This pain, however, was different than the pain in his lower back.  (Id.)

Plaintiff had been seeing a psychiatrist, Dr. Anderson, for three years for bipolar disorder and attention deficit disorder ("ADD").  (Id. at 32.)  Dr. Anderson had prescribed different medications, which had helped a little.  (Id.)  He had tried counseling; it had not helped.  (Id.)

Typically, Plaintiff got up between 8:00 and 10:00 in the morning and tried to do some stretching exercises.  (Id. at 33.)  He sat and watched the news on televison.  (Id.)  He ate some breakfast, usually a doughnut.  (Id. at 33, 34.)  Sometimes, he or his son had a doctor's appointment.  (Id. at 33.)  He tried to go for a walk or exercise.  (Id. at 33-34.)  He had difficulty doing any household chores.  (Id. at 34.)  He usually wore "sweats."  (Id.)  His son did the yard work.  (Id. at 35.)  Approximately once a week he drove to get medicine or to a doctor's appointment.  (Id.)  He did not go shopping because it was painful for him to stand to do so.  (Id. at 36.)  He enjoyed watching sports on television.  (Id.)  He went to a

baseball game the last October, but it was hard sitting through it. (Id. at 36, 41.) He did not

belong to any social organizations, clubs, or churches. (Id. at 36.) His friends occasionally

came over to watch sports with him, but he did not go to movies or out to dinner. (Id.) He

spent 85 % of his day laying down or sitting in his recliner. (Id. at 39.)

He had had the pain he described in his lower back for at least 20 years, but it had

gotten worse in the past three to four years. (Id. at 41.) He had had pain in his middle back

for one year. (Id.) He was diagnosed with bipolar disorder approximately three years ago,

but he had had the symptoms all his life. (Id.) He took Zoloft, Zyprexa, and Depakote for

the disorder and for ADD. (Id. at 41-42.) He last used his TENS unit a month before. (Id.

at 42.) When he was using it, he did so every day. (Id.) He did aquatic therapy for one

month. (Id. at 43.) It did not help. (Id.)

Michael Brethauer testified as a VE. (Id. at 44-50.) Asked the following question,

he replied, "No":

> If you would assume a hypothetical worker able to lift and carry 20 pounds
> occasionally, 10 pounds frequently. Who could stand and/or walk for up to
> two hours in an eight-hour workday, assuming the normally-allowed breaks.
> Sit for up to six hours in an eight-hour workday, assuming the normal breaks.
> Who should not engage in climbing items such as ladders or scaffolds on the
> job. Only occasionally be required to use ramps or stairs, kneel, stoop, crouch,
> or crawl. Who would be able to engage in occasional or less intensive or
> extensive interpersonal interaction on the job, or close coordination or
> communication with coworkers or supervisors on the job. Have less than
> occasional contact with the public involving handling complaints or
> dissatisfied customers. Who would be limited to occupations involving
> understanding, remembering, and following simple instructions and directions,
> and working in a routine work setting. If you were to rely on those factors,
> would that allow the performance of any of the past work you've indicated?

(Id. at 45-46.) An individual with the limitations and abilities described and with Plaintiff's education, age, and work experience would, however, be able to perform other work. (Id. at 46.) Specifically, that person could work as a hand packer or packager, parking lot attendant, or dining room attendant or bus person. (Id.) If the person could not lift anything heavier than ten pounds, it would eliminate the dining room attendant/bus person job and would reduce by ninety percent the number of appropriate hand packer or packager jobs. (Id. at 46-47.) It would not affect the parking lot attendant jobs. (Id. at 47.) If the person also had to take a one-hour break during the day, the number of appropriate jobs would be reduced by ninety percent. (Id.) If the person also could not sit for longer than 30 minutes without having to stand for at least 10 minutes, there would be less than 100 jobs in the relevant labor market that would fit all the necessary criteria. (Id. at 49.[3]) If this same person had to sit in a reclined position for at least half the time, there were no job that he could perform. (Id. at 50.)

### Medical and Other Records Before the ALJ

The documentary record before the ALJ included forms Plaintiff completed as part of the reconsideration process, documents generated pursuant to his request, records from various health care providers, and reports of consultants.

On a Reconsideration Disability Report, Plaintiff stated that he had been seeing doctors and receiving treatment for his back before being notified of the proposed termination of his DIB. (Id. at 214.) However, his back was getting worse, not better. (Id.)

---

[3]The administrative record inexplicably skipped "48" in numbering the pages.

He continued to try different treatments and to do exercises. (Id.) He was taking 18 to 24 Percocet a day just to be able to move around. (Id.) On another form, Plaintiff listed severe mood swings in addition to his impairments of leukemia, degenerative disc disease, bipolar disorder, ADD, and lower back pain. (Id. at 226.) Medication made him light-headed and dizzy, weak, and fatigued. (Id.) He could not concentrate. (Id.) He could not sit to drive for long. (Id. at 228.) He was easily angered and was irritable at times. (Id.) He took a medication, Ambien, to sleep at night. (Id. at 229.)

On a separate, pain questionnaire, Plaintiff reported that he had pain primarily in his lower back. (Id. at 173.) He could not bend without pain. (Id.) He has tried aquatic therapy, physical therapy, and pain management courses to help reduce the pain. (Id.) And, he takes oxycodone for pain. (Id.) On a separate form, Plaintiff reported that he could watch a 30-minute televison show, but not a 60-minute show. (Id. at 177.) He has problems comprehending what he reads. (Id. at 178.) In another pain questionnaire, Plaintiff described his back pain as varying from severe to sharp, at which point it became unbearable. (Id. at 225.) It was constant, but became worse with movement or when he stood or sat for at least 10 to 20 minutes. (Id.) The medication he took for his leukemia made him sick to his stomach. (Id.) He had tried spinal blocks and physical therapy; neither gave him relief. (Id.)

Completing a function report on her son's behalf, JoAnn O'Brien stated that Plaintiff easily became dizzy and fatigued. (Id. at 163.) He had difficulty sleeping, even with medication. (Id. at 164.) He had difficulty bending to put on his shoes and needed to be

reminded to shave.  (Id. at 164-65.)  He would try to do laundry, but would forget to move

it from the washer to the dryer.  (Id. at 165.)  He could not sit for long periods of time.  (Id.

at 167.)  He did not get along well with other people, and would leave the house only to go

to Walgreen's or to doctor appointments.  (Id.)  He could walk no farther than two blocks,

and then had to stop and rest for at least 10 minutes.  (Id. at 168.)  Additionally, he could not

concentrate for long and seldom finished watching a movie or game.  (Id.)

Plaintiff's medical treatment records before the ALJ begin in 2000.

In March of that year, a magnetic resonance imaging scan ("MRI") of Plaintiff's

lumbar spine revealed a mild degenerative disc disease at several levels, but was otherwise

normal.  (Id. at 361.)

Records from a "ZGI, M.D.," dated January 29, 2001, report that Plaintiff had a one-

year history of pain in his hips.  (Id. at 356.)  He was currently having pain in his low back,

pain he described as being worse than the pain in his hips.  (Id.)  He did not have any

numbness or weakness.  (Id.)  The notation further reads, "The patient is . . . chronically on

Oxycontin and Percocet, although the reasons for this are unclear."  (Id.)  On examination,

he was able to walk with a reciprocal gait.  (Id.)  He had full motor strength in all his lower

extremities, and his reflects were intact and symmetrical.  (Id.)  He did not have any pain

with range of motion in either hip, but did have some pain on palpation of his lumbar spine.

(Id.)  The physician declined Plaintiff's request for a refill of his prescriptions and referred

him to physical therapy.  (Id.)

Plaintiff consulted Richard Anderson, M.D., Ph.D., in July 2001 about his anger and mood swings. (Id. at 396-97.) His social history included occasional use of marijuana and alcohol. (Id. at 396.) On examination, Plaintiff was alert and oriented, had a regular rate and volume of speech, although it was "slightly increased in intensity," and a logical and sequential flow of thought. (Id. at 397.) "Judgment and insight were adequate." (Id.) The diagnosis was mood disorder; bipolar disorder and attention deficit disorder were to be ruled out. (Id.) He was to be started on Lithium and to return in six weeks. (Id.) The next office visit was in September 2002. (Id. at 395.)

Beverly Field, Ph.D., a clinical psychologist first saw Plaintiff in October 2001, at the request of Robert A. Swarm, M.D., with the Washington University Pain Management Center. (Id. at 366-68.) Plaintiff reported a twenty-year history of back pain, treated with chiropractic care, acupuncture, lumbar epidural steroid injections, physical therapy, and medications. (Id. at 366.) He had been in a motor vehicle accident six to seven years ago, and had injured his cervical spine. (Id. at 367.) He further reported that the results of an MRI of his hips revealed the probability that he would need a hip replacement in the future. (Id. at 366.) Plaintiff described his average pain as being a five on a ten-point scale. (Id.) Although he shifted position once, he was able to sit through most of the interview "without additional pain behavior." (Id. at 366-67.) Plaintiff's history included a three-year term of incarceration for substance abuse and a period of daily sessions for anger management. (Id. at 367.) Dr. Field concluded, in part, given Plaintiff's history of substance abuse and of impulsive behavior, he was a high-risk candidate for chronic opioid therapy. (Id. at 368.)

Moreover, "[b]ased on his interactions which were intense and dramatic, with rapid speech and vagueness, differential diagnoses include: bipolar disorder, medication induced mood disorder, substance induced mood disorder." (Id.) She would continue to evaluate him after a "pain conference." (Id.) A pain conference was held on November 1. (Id. at 365.) Dr. Field next saw Plaintiff two years later.[4] (Id. at 363-64.)

In June 2002, Dr. Swarm administered local anesthetic medial branch nerve blocks at L3, L4, and L5 to try to alleviate Plaintiff's back pain. (Id. at 390-91.) He noted that the pain had not responded to physical therapy and was not controlled by opioid and nonopioid analgesics. (Id. at 390.) Three days later, Plaintiff reported that the nerve blocks had not helped; indeed, his pain was worse. (Id. at 389.) Plaintiff was instructed to continue with physical therapy and take extra-strength Tylenol and oxycodone as prescribed. (Id.) The next day, Plaintiff reported that the pain was too great for him to do physical therapy. (Id.) He was then taking 18 tablets of oxycodone a day. (Id.) After his prescription for oxycodone was renewed twice, Plaintiff called Dr. Swarm on July 31 to inquire if he should continue with physical therapy. (Id. at 388.) He should. (Id.)

Plaintiff consulted John D. Wilkes, M.D., for his CML in August. (Id. at 410-11.) Dr. Wilkes noted that Plaintiff had been switched from Medicaid to Medicare and was having difficulty getting financial assistance with his prescriptions, including his antidepressants. (Id. at 410.) He was having problems with his back and his bipolar disorder was aggravated. (Id.) He attributed the decrease in energy to his chronic pain. (Id.)

_____

[4]See pages 13 and 14, infra.

Plaintiff next saw Dr. Swarm in September, reporting that he had upper back and neck pain in addition to the low back pain. (Id. at 387.) Dr. Swarm diagnosed Plaintiff with chronic lumbago; lumbar degenerative disc disease with posterior disc bulges at L3-4 and L4-5; exacerbation of pain with lumbar extension; history of leukemia; and cervicalgia with cervical degenerative disc disease at C3-4, C4-5, C5-6, and C6-7. (Id.) He discussed with Plaintiff his concerns about opioid tolerance hyperalgesia and the need for a conditioning exercise program. (Id.) Plaintiff was to return to physical therapy. (Id.)

A few weeks later, Plaintiff consulted Dr. Anderson for the second time. (Id. at 395.) He had had to stop taking his medicine for awhile because of the cost. (Id.) His son was at Boy's Town. (Id.) Plaintiff's mood was "somewhat better"; his anger and patience were better. (Id.) Bipolar affective disorder was listed as a diagnosis. (Id.) Plaintiff was prescribed Zyprexa, Zoloft, and Depakote. (Id.) Plaintiff returned to Dr. Anderson in December, explaining that he was trying to get Medicaid for the expensive medication and he thought he had ADD. (Id.) His anger was usually better; he was to pick up his son at Boy's Town. (Id.) He was, however, disorganized and found it difficult to concentrate when reading. (Id.) The remaining notations of Dr. Anderson are for prescription refills until June 2003. (Id.)

The month before the December return visit to Dr. Anderson, Plaintiff returned to Dr. Wilkes for his CML. (Id. at 409.) His CML was stable; however, he continued to have difficulties with his chronic back pain and bipolar disorder and trouble affording the medications for both. (Id.)

On January 24, 2003, Plaintiff reported to Dr. Wilkes that he was tolerating the medication for his CML well. (Id. at 408.) When he took his medications, his energy level was good and his psychiatric disturbances were "controlled for the most part." (Id.)

Six days later, Plaintiff went to the emergency room with complaints of low back pain. (Id. at 403.) Oxycontin was not helping. (Id.)

When Dr. Swarm again saw Plaintiff, in February, he had been taking 18 to 20 tablets of oxycodone and had had to go the emergency room the week before and obtain a limited refill. (Id. at 385.) Even so, he had run out of the prescription the day before. (Id.) On examination, Plaintiff walked with a "reasonably symmetric gait" and was able to easily walk on heels and toes. (Id.) He had some exacerbation of back pain with flexion, left lateral bending, and lumbar extension. (Id.) There was "significant lumbar paravertebral muscle tenderness." (Id.) Straight leg raises were negative. (Id.) Dr. Swarm concluded that "[i]t [wa]s difficult to understand the recent severe exacerbation of pain[.]" (Id.) Physical examination did not show any radicular problem, nor did Plaintiff complain of one. (Id.) The problem of opioid tolerance hyperalgesia was again discussed. (Id.) An MRI was to be obtained of his lumbar spine. (Id.)

The next month, on March 10, Plaintiff reported to Dr. Swarm that he was continuing to take approximately 20 tablets of oxycodone a day. (Id. at 383.) The MRI scan had shown lumbar degenerative disc disease, especially at L4-5 with an annular tear and some bilateral neural foraminal narrowing. (Id.) Plaintiff also reported that he had had some success with conditioning exercises and wanted to continue. (Id.) He wanted to defer a decision on

bilateral L4-5 nerve root injections.  (Id.)  Dr. Swarm asked Plaintiff to gradually decrease the number of oxycodone tablets he was taking.  (Id. at 384.)

Plaintiff informed Dr. Anderson in June that he thought things were going okay.  (Id. at 394.)  He had not hit his children for at least one year and was on Medicaid "spend down." (Id.)

Plaintiff reported modest progress with the conditioning exercise program when he saw Dr. Swarm again, on June 23, although he admitted that he had not been "entirely consistent with his use of physical therapy."  (Id. at 379-81.)  He had consulted Timothy Graven, D.O., for osteopathic manipulation[5]; Dr. Graven did not use manipulation but did recommend a Medrol Dosepak and computed tomography ("CT") myelogram.  (Id. at 379.) Because Plaintiff did not want to undergo surgery, the latter idea was discarded.  (Id.)  Dr. Swarm encouraged him not to pursue the former at the present time.  (Id.)  Dr. Swarm stressed to Plaintiff that the physical therapy and exercise programs should be the principal focus of his pain management strategies.  (Id. at 380.)

Plaintiff's visit on July 11 to Dr. Wilkes for his CML was unremarkable.  (Id. at 407.)

On July 17, Plaintiff went to the emergency room with complaints of chronic low back pain with no specific injury.  (Id. at 399-402.)  X-rays of his lumbosacral spine revealed early degenerative changes consistent with his age.  (Id. at 402.)  A physician's consultation notes reads that Plaintiff's pain was "better managed" after a day in the hospital with oral medication.  (Id. at 355.)  Nonoperative care was recommended.  (Id.)

---

[5]See Record at 419 (Dr. Graven's notations).

Plaintiff's prescriptions for oxycodone were regularly renewed, including in August. (Id. at 277.)  A few days after the August renewal, a notation in Dr. Swarm's records reads that someone from Walgreen's had called to report that Plaintiff had received a prescription for Percocet from Gary Farley, D.O., three days before.  (Id.)  Dr. Farley's note of August 4 reflects that Plaintiff was started on some exercises and medication after an MRI revealed a bulging disc at L4-5 and some degenerative discs.  (Id.)

Plaintiff consulted Dr. Swarm again in September, reporting that his back pain was at its most intense.  (Id. at 245, 268-71, 377-78.)  On a ten-point scale, his pain was then at a six and had varied during the previous week from six to ten.  (Id. at 245, 268, 377.)  He continued to have insomnia and panic attacks.  (Id. at 245, 377.)  The plan was to have him evaluated for participation in cognitive behavioral group therapies, to continue him on opioid analgesics, such as the oxycodone he was then taking, and to repeat a lumbar spine MRI to see if the underlying spine pathology had worsened.  (Id. at 246.)  Plaintiff did not want to repeat epidural steroid injections.  (Id.)

Plaintiff saw Dr. Wilkes in November.  (Id. at 338, 347-48.)  His chronic phase CML was stable, and he continued to tolerate the medication, Gleevec, "quite well."  (Id. at 338.)  He continued to suffer from arthritis in his hip and low back.  (Id.)  He was to return in three months.  (Id.)  The same day, Plaintiff saw Dr. Field again.  (Id. at 363-64.)  He reported that he was doing better during the day.  (Id. at 364.)  He did a home exercise program, had to change positions often, and was busy calling his doctors.  (Id.)  Also in the home was his 90-

year grandmother, his 16-year old son, and, recently, his 17-year old daughter.  (Id. at 363-64.)

Four days later, Plaintiff saw Dr. Farley for his middle to lower back pain.  (Id. at 286, 354.)  Noting that Plaintiff was on high doses of oxycodone, Dr. Farley recommended a TENS unit and aquatic therapy to decrease his need for pain medication.  (Id.)

When Petitioner returned to Dr. Swarm, in December 2003, he reported low back pain and occasional pain in his entire back.  (Id. at 265.)  His pain was then at a five on a ten-point scale.  (Id.)  The highest it had been in the past week was a six.  (Id.)  He was fatigued.  (Id.)  On December 17, Plaintiff began aquatic therapy to decrease his pain and "improve his ability to tolerate his daily activities."  (Id. at 281-83.)  He complained of constant, centrally-located, low back pain that increased with bending or sitting or standing for longer than 30 minutes and of intermittent upper back pain.  (Id. at 281.)  He was to be seen two or three times a week for four to five weeks.  (Id. at 282.)

After completing eight sessions, Plaintiff was discharged on January 27, 2004, from the aquatic therapy program.  (Id. at 278-79.)  At that time, he was demonstrating "functional [lower extremity] and trunk mobility and strength."  (Id. at 278.)  His lumbar and lower extremity motion had improved and was within functional limits.  (Id. at 278, 279.)  He rated his pain as a four on a ten-point scale.  (Id. at 278.)  He was to continue with his home exercise program.  (Id.)  The therapist opined that he would continue to improve with proper compliance with the program.  (Id.)

Plaintiff went to the emergency room on February 4, complaining of shortness of breath, coughing, and pain in his lower spine. (Id. at 314-33.) A chest x-ray revealed minimal atelectasis in his left lung, or a decrease or loss of air in that lung, but was otherwise unremarkable. (Id. at 333.) The primary diagnosis was an upper respiratory infection; the secondary diagnosis was atelectasis. (Id. at 327.)

Five days later, Plaintiff returned to Dr. Wilkes for a checkup. (Id. at 336, 346.) His hematologic parameters, including his white blood cell count, remained stable. (Id. at 336.) He reported "doing well for the most part," although he had recently had had upper respiratory congestion and a cough. (Id.) "His bone pain is much improved with the aid of a TENS unit." (Id.) He was to continue on his medication and return in three months. (Id.)

A few weeks later, Plaintiff saw Dr. Anderson, reporting a depressed mood and trouble sleeping. (Id. at 350.) He was taking pain management and exercises classes. (Id.) He was prescribed Ambien for the insomnia, Zoloft for his bipolar affective disorder, and Zyprexa. (Id.) A diagnosis of ADD was crossed out with a notation that it related to Plaintiff's son. (Id.)

At a three-month follow-up in March, Dr. Field reported that Plaintiff had informed her that his leukemia had resolved; however, his back pain was so severe that he could not work. (Id. at 244.) He was to return in six months. (Id.)

The next month, Plaintiff saw Dr. Swarm. (Id. at 259-64.) He complained of pain in his lower and upper back and in his shoulders, the latter for the past several months. (Id.

at 259.)  The pain was then a six on a ten-point scale and at its worst was an eight.  (<u>Id.</u>)  He

was sleeping okay, but was fatigued.  (<u>Id.</u>)  His depression was described as "okay."  (<u>Id.</u>)

On May 3, Plaintiff went to the emergency room with complaints of severe left flank

pain for the past six hours.  (<u>Id.</u> at 292-313.)  The pain had begun spontaneously and was a

ten on a ten-point scale.  (<u>Id.</u> at 296, 298.)  He had minimal relief with morphine sulfate.  (<u>Id.</u>

at 296.)  A CT scan of his abdomen and pelvis was unremarkable.  (<u>Id.</u> at 313.)  The primary

diagnosis was lumbago.  (<u>Id.</u> at 304.)  When his condition was stable, he was discharged with

a prescription for Percocet.  (<u>Id.</u> at 302.)

Three days later, Plaintiff again consulted Dr. Farley, complaining of pain in his

thoracic region in addition to the lumbar area.  (<u>Id.</u> at 285.)  His movement was restricted in

both.  (<u>Id.</u>)  He was to have an MRI.  (<u>Id.</u>)  Two weeks later, he returned and was told the

MRI revealed "some bulging discs and lateral disc protrusion at L2-3 on the right."  (<u>Id.</u> at

285, 290.)  Dr. Farley recommended pain patches, epidural steroid injections, and trigger

point injections.  (<u>Id.</u> at 285.)

Plaintiff saw Dr. Wilkes in June for a routine checkup.  (<u>Id.</u> at 335, 345.)  His chronic

phase CML was stable, and he was described as doing well on the Gleevec.  (<u>Id.</u> at 335.)

The only side effects were some mild gastrointestinal intolerance if he took the medication

on an empty stomach.  (<u>Id.</u>)  He was to continue on the Gleevec and return in four months.

(<u>Id.</u>)    In July, Plaintiff reported to Dr. Anderson that his 17-year old daughter was pregnant

and that, although he did not hit his son, he yelled at him.  (<u>Id.</u> at 349.)  He attributed this to

his bipolar disorder.  (Id.)  His motivation was decreased; his weight and his dosage of Zoloft were increased.  (Id.)

After having to cancel an appointment in July for lack of transportation, Plaintiff saw Dr. Swarm again in August.  (Id. at 249-56, 258.)  He had pain in the right side of the base of his neck and was numb down to his lower left extremity.  (Id. at 249.)  His lower back pain was no longer relieved by lying down.  (Id.)  He was sleeping well with the Ambien, but had gained weight on his other medications.  (Id.)  He reported that the aquatic therapy had not helped.  (Id.)

Petitioner returned to Dr. Farley in October, complaining of mid-thoracic pain on palpation.  (Id. at 284.)  An MRI of the area was to be obtained.  (Id.)  It did not show any pathology in his thoracic spine.  (Id. at 284, 289.)  Dr. Farley recommended a trigger point injection.  (Id. at 284.)  Plaintiff declined.  (Id.)

Also in October, Plaintiff saw Dr. Wilkes.  (Id. at 339-44.)  Other than some periocular edema, he did not experience any side effects from his medication.  (Id. at 339.)  He had no problems with bone pain and no spine tenderness on palpation.  (Id.)

On November 9, Plaintiff called Dr. Swarm's office with complaints of increased pain.  (Id. at 248.)

In addition to the records of Plaintiff's health care providers, the ALJ had before him the report of a consultative examination by David Lipsitz, Ph.D., on September 23, 2003.  (Id. at 369-73.)  Dr. Lipsitz noted that "[Plaintiff] appeared . . . somewhat agitated and anxious . . . .  He showed no difficulty with posture and gait, no involuntary movements."

(Id. at 369.)  He did not know of any past injury, but had disc disease and a ruptured disc.

(Id.)  His pain and back problems prevented him from lifting things and his CML caused him

fatigue.  (Id.)  His moods changed from day to day.  (Id. at 370.)  Dr. Anderson had

diagnosed him with bipolar disorder and attention deficit disorder.  (Id.)  He had severe

anxiety and panic attacks.  (Id.)  He did not have any problems with drugs or alcohol.  (Id.)

He saw Dr. Anderson every two to three months and a therapist, Nathan Lundeen, every two

to three weeks.  (Id.)  The longest job he had held was as a truck driver for four years.  (Id.

at 371.)  On examination, "[h]e appear[ed] to be quite agitated, very anxious, somewhat

manicky, and [ ] had difficulty sitting still."  (Id.)  His intellectual functioning appeared to

be in the "average" range.  (Id.)  "His insight and judgment were good[.]"  (Id.)  Dr. Lipsitz

diagnosed Plaintiff as having, by history, bipolar disorder, depression secondary to physical

illness, and attention deficit hyperactivity disorder.  (Id.)  He assessed him as having a Global

Assessment of Functioning[6] ("GAF") score of 50.[7]  (Id.)  Plaintiff's functional limitations

resulted in marked restrictions of daily living, moderate difficulties in maintaining social

functioning, and mild deficiencies in concentration, persistence or pace.  (Id.)  It was

---

[6]"According to the Diagnostic and Statistical Manual of Mental Disorders 32 (4th Text Rev. 2000), the Global Assessment of Functioning Scale is used to report 'the clinician's judgment of the individual's overall level of functioning.'"  **Hudson v. Barnhart**, 345 F.3d 661, 663 n. 2 (8th Cir. 2003).  See also  **Bridges v. Massanari**, 2001 WL 883218, *5 n.1 (E.D. La. July 30, 2001) ("The GAF orders the evaluating physician to consider psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." (interim quotations omitted)).

[7]A GAF score between 41 and 50 is indicative of "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  Diagnostic Manual at 34.

unknown whether these limitations resulted in repeated episodes of deterioration in a work-like setting.  (Id. at 373.)

The following month, a Psychiatric Review Technique form ("PRTF") for Plaintiff was completed by Paul Stuve, Ph.D., a licensed psychologist.  (Id. at 183-96.)  Dr. Stuve reported that Plaintiff had an affective disorder, i.e., bipolar disorder, that resulted in mild restriction of his activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, and pace.  (Id. at 186, 193.)  He had no repeated episodes of decompensation of any duration.  (Id. at 193.)

Dr. Stuve also completed a Mental Residual Functional Capacity Assessment ("MRFCA") of Plaintiff.  (Id. at 179-82.)  Of twenty listed mental activities, Plaintiff was rated as "moderately limited" in five:  his "ability to work in coordination with or proximity to others without being distracted by them"; his "ability to interact appropriately with the general public"; his "ability to accept instructions and respond appropriately to criticism from supervisors"; his "ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes"; and his "ability to respond appropriately to changes in the work setting."  (Id. at 179-80.)  In the remaining fifteen activities, he was either not significantly limited or there was no evidence of limitation.  (Id.)

The same month Dr. Stuve completed his assessments, Robert Silvers, M.D., completed a Physical Residual Functional Capacity Assessment ("PRFCA") of Plaintiff.  (Id. at 197-204.)  The primary diagnosis was CML; the secondary diagnosis was degenerative disc disease in his lumbar spine.  (Id. at 197.)  These impairments resulted in exertional

limitations of being able to occasionally lift twenty pounds, frequently lift ten pounds, stand or walk about two hours in an eight-hour workday, and sit for about six hours in that time period. (Id. at 198.) He had postural limitations of avoiding climbing, balancing, stooping, kneeling, crouching, and crawling. (Id. at 199.) He had no manipulative, visual, communicative, or environmental limitations. (Id. at 200-01.) Dr. Silvers opined that Plaintiff's complaints were disproportionate to the objective medical evidence and were only partially credible. (Id. at 202.)

Two months after Dr. Stuve completed his MRFCA, Rocco Cottone, Ph.D., completed one. (Id. at 123-26.) Dr. Cottone agreed with Dr. Stuve on his assessment of the degree of limitation Plaintiff experienced in four of the twenty mental activities. (Id. at 123-24.) He did not find, as did Dr. Stuve, that Plaintiff was moderately limited in his "ability to respond appropriately to changes in the work setting." (Id. at 124.) He found no significant limitation in that activity. (Id.) He did, however, find moderate limitations in five other activities[8] and a marked limitation in two: "[t]he ability to understand and remember detailed instructions" and "[t]he ability to carry out detailed instructions." (Id. at 123.) On the PRTF, Dr. Cottone's assessment of Plaintiff's functional limitations also varied from Dr. Stuve's. (Id. at 128-41.) Although he agreed with Dr. Stuve that Plaintiff had mild restrictions in his activities of daily living, he concluded that Plaintiff had moderate difficulties in maintaining

_____

[8]The five activities are: "[t]he ability to maintain attention and concentration for extended periods"; [t]he ability to sustain an ordinary routine without special supervision"; "[t]he ability to complete a normal workday and workweek without interruptions from psychologically based symptoms . . ."; "[t]he ability to be aware of normal hazards and take appropriate precautions"; and "[t]he ability to set realistic goals or make plans independently of others." (Id. at 123-24.)

social functioning and in maintaining concentration, persistence, or pace. (Id. at 138.) He found that Plaintiff had had one or two episodes of decompensation. (Id.)

A PRFCA completed by Dennis McGraw, D.O., a few months after Dr. Silvers completed his differed from the earlier assessment only in one postural limitation – that Plaintiff should never climb a ladder, rope, or scaffolds. (Id. at 115-21.)

## The ALJ's Decision

The ALJ first found that Plaintiff's leukemia was in remission; consequently, he had had medical improvement. (Id. at 12.) He now had, however, in addition to the leukemia in remission, degenerative and discogenic disorders of the back and an affective mood disorder. (Id.) Those disorders were not of Listing-level severity. (Id.) The question then was whether they prevented him from performing his past relevant work or any other work existing in significant numbers in the local or national economy. (Id. at 13.)

In order to answer this question, the ALJ assessed Plaintiff's credibility. (Id.) After summarizing Plaintiff's testimony and Dr. Wilkes' medical records, the ALJ noted that Plaintiff had been complaining of intense middle and lower back pain since 2000, an x-ray had revealed only moderate changes in his spine and hips, and a record from 2001 indicated a concern that he was seeking refills of Percocet and Oxycontin. (Id. at 13A.[9]) The same record indicated that he was refused a refill of both and it was recommended that he not be prescribed any narcotic-based medication. (Id.) "This treatment note calls into question the true motivation for [Plaintiff's] continuing complaints of extreme back pain[.]" (Id.)

_____

[9]Page 13A was separately filed and docketed.

The ALJ next summarized Dr. Swarm's records and noted that Plaintiff had stopped participating in physical therapy and was not interested in any further injection therapy. (Id. at 14.) The ALJ found this approach to be inconsistent with severe, disabling pain, as was Plaintiff's refusal to undergo another trigger point injection and his failure to return to Dr. Farley after it was suggested that he do so. (Id.)

The ALJ noted Dr. Field's and Dr. Lipsitz's evaluations and the assessments of Drs. Cottone and McGraw. (Id. at 14-15.) He also noted the lack of any limitations placed on Plaintiff by any of his health care providers and the lack of any assistive device. (Id. at 15.) He then found:

> The medical records do not document the presence of long term and significant atrophy or loss of muscle tone. It appears that, if true, allegations of debilitating mental and physical symptoms and limitations, including severe pain and limitation of motion, precluding even sedentary work activity for a period of at least four years in duration, would result in medical records documenting at least some significant atrophy or loss of muscle tone. Thus, the lack of such medical documentation is inconsistent with [Plaintiff's] allegations of disability.

(Id.) For the same reasons that the ALJ found Plaintiff's allegations of disability not to be credible, he found his description of his activities of daily living not to be credible. (Id.)

The ALJ concluded that Plaintiff had the residual functional capacity with the physical limitations described by Dr. McGraw and had mental limitations that precluded "more than occasional intensive or extensive interpersonal interaction or close coordination or communication with co-workers and supervisors; more than occasional contact with the public . . .; and understanding, remembering and carrying out more than simple instruction

in a routine work environment." (Id. at 16.)  With these limitations, Plaintiff could not, according to the VE, return to his past relevant work.  (Id.)  Based on the VE's testimony about available jobs, Plaintiff could perform a "significant number of jobs in the national and state economies." (Id.)  He was, therefore, capable of performing substantial gainful activity after October 15, 2003, and was not disabled within the meaning of the Act.  (Id.)

### Additional Medical Records Before the Appeals Council

After the ALJ rendered his decision, Plaintiff submitted a letter from Dr. Anderson to the Appeals Council.  (Id. at 428.)  Dr. Anderson described Plaintiff as being compliant with his medication and with keeping appointments.  (Id.)  He had no reason to consider Plaintiff "less than trustworthy" and felt he had "a real chronic pain syndrome from cervical and other back pain which has not been sufficiently treatable with medications and injections[.]"  (Id.)  It was Dr. Anderson's opinion, "to a reasonable degree of medical certainty that [Plaintiff] is 100% medically disabled as a combination of his psychiatric condition and also his back condition and chronic pain syndrome."  (Id.)

### Legal Standards

Under the Social Security Act, the Commissioner shall find a person disabled if the claimant is unable "to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death.[10]  42 U.S.C. § 423(d)(1)(A).  The

---

[10]This standard applies to the continued entitlement to DIB as well as to an initial entitlement. **Mathews v. Eldridge**, 424 U.S. 319, 336 (1976).

impairment suffered must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A) (alteration added).

The Commissioner has established a five-step process for determining whether a person is disabled.[11] See 20 C.F.R. § 404.1520. See also **Johnson v. Barnhart**, 390 F.3d 1067, 1070 (8th Cir. 2004); **Ramirez v. Barnhart**, 292 F.3d 576, 580 (8th Cir. 2002); **Pearsall v. Massanari**, 274 F.3d 1211, 1217 (8th Cir. 2002). "Each step in the disability determination entails a separate analysis and legal standard." **Lacroix v. Barnhart**, 465 F.3d 881, 888 (8th Cir. 2006). First, the claimant cannot be presently engaged in "substantial gainful activity." See 20 C.F.R. § 404.1520(b). Second, the claimant must have a severe impairment. See 20 C.F.R. § 404.1520(c). The Social Security Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . ." Id. (alterations added). "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on

---

[11] A different sequential evaluation process applies when the issue is whether the condition that resulted in the initial entitlement to DIB has sufficiently improved that the claimant was no longer disabled. See 20 C.F.R. § 404.1594(f). Because the question in the instant case is whether Plaintiff's other impairments render him disabled within the meaning of the Act, not whether his leukemia satisfies the criteria for medical improvement, the Court will follow the familiar five-step sequential evaluation. This evaluation mirrors the last, relevant steps of the standard for medical improvement. See 20 C.F.R. §§ 404.1594(f)(6) & (7).

h[is] ability to work." **Caviness v. Massanari**, 250 F.3d 603, 605 (8th Cir. 2001) (alteration added).

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement. See 20 C.F.R. § 404.1520(d), and Part 404, Subpart P, Appendix 1. If the claimant meets this requirement, he is presumed to be disabled and is entitled to benefits. **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

At the fourth step, the ALJ will "review [claimant's] residual functional capacity ["RFC"] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. §§ 404.1520(e) and 416.920(e) (alterations added). "[RFC] is what the claimant is able to do despite limitations caused by all the claimant's impairments." **Lowe v. Apfel**, 226 F.3d 969, 972 (8th Cir. 2000) (citing 20 C.F.R. § 404.1545(a)) (alteration added). "[RFC] 'is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.'" **Ingram v. Chater**, 107 F.3d 598, 604 (8th Cir. 1997) (quoting McCoy v. Schweiker, 683 F.2d 1138, 1147 (8th Cir. 1982) (en banc)) (alteration added). Moreover, "[RFC] is a determination based upon all the record evidence[,]" not only medical evidence. **Dykes v. Apfel**, 223 F.3d 865, 866-67 (8th Cir. 2000) (alterations added). Some medical evidence must be included in the record to support an ALJ's RFC holding. **Id.** at 867. "The need for medical evidence,

however, does not require the [Commissioner] to produce additional evidence not already within the record. '[A]n ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision.'" **Howard v. Massanari**, 255 F.3d 577, 581 (8th Cir. 2001) (quoting <u>Frankl v. Shalala</u>, 47 F.3d 935, 937-38 (8th Cir. 1995)) (alterations in original).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. **<u>Ramirez</u>**, 292 F.3d at 580-81; **<u>Pearsall</u>**, 274 F.3d at 1217. This evaluation requires that the ALJ consider "(1) a claimant's daily activities, (2) the duration, frequency, and intensity of pain, (3) precipitating and aggravating factors, (4) dosage, effectiveness, and side effects of medication, and (5) residual functions." **<u>Ramirez</u>**, 292 F.3d at 581 (citing <u>Polaski v. Heckler</u>, 739 F.2d 1320, 1322 (8th Cir. 1984) (subsequent history omitted)). Although an ALJ may not disregard subjective complaints of pain based only on a lack of objective medical evidence fully supporting such complaints, "an ALJ is entitled to make a factual determination that a Claimant's subjective pain complaints are not credible in light of objective medical evidence to the contrary." **<u>Id.</u>** <u>See also</u> **McKinney v. Apfel**, 228 F.3d 860, 864 (8th Cir. 2000) ("An ALJ may undertake a credibility analysis when the medical evidence regarding a claimant's disability is inconsistent."). After considering the <u>Polaski</u> factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000); **Beckley v. Apfel**, 152 F.3d 1056, 1059 (8th Cir. 1998).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the question at step five is whether the claimant maintains the RFC to perform a significant number of jobs within the national economy.  **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001).  <u>See</u> <u>also</u> 20 C.F.R. § 404.1520(f).  The Commissioner may meet his burden by eliciting testimony by a VE.  **Pearsall**, 274 F.3d at 1219.  If the claimant is prevented by his impairment from doing any other work, the ALJ will find the claimant to be disabled.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court if it is supported by "substantial evidence on the record as a whole."  **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001); **Clark v. Apfel**, 141 F.3d 1253, 1255 (8th Cir. 1998); **Frankl**, 47 F.3d at 937.  "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the decision."  **Strongson v. Barnhart**, 361 F.3d 1066, 1069-70 (8th Cir. 2004) (interim quotations omitted).  When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the court must also take into account whatever in the record fairly detracts from that decision.  **Warburton v. Apfel**, 188 F.3d 1047, 1050 (8th Cir. 1999); **Baker v. Apfel**, 159 F.3d 1140, 1144 (8th Cir. 1998).  The court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it "might have decided the case differently," **Strongson**, 361 F.3d at 1070.  Thus, if "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, the

[Court] must affirm the agency's decision." **Wheeler v. Apfel**, 244 F.3d 891, 894-95 (8th Cir. 2000) (alteration added).

**Discussion**

Plaintiff argues that the ALJ (1) improperly "cherry-picked" which medical evidence to be given weight, ignoring or discounting favorable and consistent medical records; (2) improperly weighed the medical evidence, specifically by failing to give the greater weight to the reports of Dr. Swarm and the records of Dr. Anderson; and (3) erred in finding Plaintiff not to be credible. The Commissioner disagrees.

The Medical Evidence. Plaintiff first takes issue with the ALJ's notation of the remark in a 2001 medical record questioning why Plaintiff was on Oxycontin and Percocet and his own subsequent remark questioning Plaintiff's motivation. This is not error.

As noted above, "[w]hen determining a claimant's RFC, the ALJ must consider all relevant evidence, including the claimant's own description of her or his limitations, as well as medical records, and observations of treating physicians and others." **Roberson v. Astrue**, 481 F.3d 1020, 1023 (8th Cir. 2007) (alteration added). Consistent throughout Plaintiff's medical records include renewals of opioid pain relievers, his clear preference for such relievers compared to other methods of treatment, and his physicians' concerns about his dependency on such relievers. Indeed, Dr. Field considered Plaintiff to be at high risk for becoming dependent on opioids for pain relief due, in part, to his self-reported history of substance abuse. The ALJ's comment is not error. See **Anderson v. Barnhart**, 344 F.3d 809, 815 (8th Cir. 2003) (noting that a claimant's "misuse of medications" is a valid factor

- 28 -

when assessing the claimant's credibility).  Additionally, Plaintiff correctly notes that the 2001 record was generated while he was on disability and challenges its relevancy to the 2003 termination decision.  Plaintiff was on disability for leukemia, however, not for a back impairment.  The 2001 record is relevant to whether that impairment is disabling.  See **Pirtle v. Astrue**, 479 F.3d 931, 934 (8th Cir. 2007) (noting that ALJ may consider medical records and opinions dated prior to relevant date).

Plaintiff also challenges the ALJ's conclusion that his allegations of disabling back pain were undermined by the absence of reference in the records to any loss of muscle tone or atrophy and the ALJ's inconsistent findings that he was reluctant to participate in treatment and yet did engage in physical therapy, a home exercise program, and walking.  This challenge is unavailing.

The ALJ's observation about the absence of any reference in the medical records to a loss of muscle tone or to atrophy is relevant.  See e.g. **Charles v. Barnhart**, 375 F.3d 777, 780 (8th Cir. 2004) (noting consultative physical examination finding that claimant alleging disabling back pain had normal muscle strength, tone, and mass); **Masterson v. Barnhart**, 363 F.3d 731, 735 (8th Cir. 2004) (noting testimony by expert witness that herniated disc had not caused any muscle atrophy and that medical evidence related to back did not support any limitations on claimant's abilities to bend, twist, squat, and climb); **Ramirez**, 292 F.3d at 579 (noting that consultative physical examination of claimant alleging disabling back pain had revealed no muscle atrophy).

The ALJ's conclusion that Plaintiff was reluctant to participate in treatment is also supported by the record. Any treatment option other than opioids was rejected by Plaintiff. He reported that the steroid injections were not helpful. Although he also reported that he participated in physical therapy and a home exercise program, there are no records supporting the former and his description of his home exercise program was that he tried to do some stretching and tried to walk. There are records of him participating in aquatic therapy. After eight sessions, his lumbar and lower extremity motion was within functional limits and he had functional lower extremity and trunk mobility and strength. And, his pain level had decreased. The therapist opined that he would continue to improve if he complied with a home exercise program. Regardless, Plaintiff later reported that the aquatic therapy did not help. The aquatic therapy records are the only records of a provider's assessment of the success of a course of treatment. When Plaintiff was reporting the success, alternative treatments invariably failed, with the exception of a few reports of improvement with home conditioning exercises or of a preference for physical therapy when another non-drug alternative was suggested.

Plaintiff next argues that the record as a whole of his mental impairment is not inconsistent. The ALJ found otherwise. The records before the ALJ of Plaintiff's mental impairment begin in July 2001 and end in July 2004. His visits during that three year period include six visits to Dr. Anderson and four to Dr. Field. His first visit to Dr. Anderson ended with him being prescribed Lithium and told to return in six weeks. He returned fourteen months later. His first visit to Dr. Field includes his report of a motor vehicle accident in

which he injured his cervical spine and her observation that he was able to sit through the interview without having to change position more than once.  After his second visit to Dr. Field, he did not see her for two years.  He told Dr. Lipsitz that he saw Dr. Anderson every two to three months – he averaged once every six months – and saw a therapist every two to three weeks – there are no records of him doing so.  He testified and told Dr. Lipsitz he had been diagnosed with ADD; the records do not support this.

Dr. Anderson wrote, contrary to the ALJ's earlier conclusion that no treating or examining physician had found or imposed any significant, long-term restrictions on him, that Plaintiff was "100% medically disabled."[12]  This opinion "'involves an issue reserved for the Commissioner[,]'" **Vandenboom v. Barnhart**, 421 F.3d 745, 750 (8th Cir. 2005) (alteration added), as does Dr. Anderson's conclusion that Plaintiff is trustworthy.[13]

And, contrary to Plaintiff's argument, the ALJ did not err by considering Plaintiff's statements to Dr. Wilkes about his general well being.  Although Dr. Wilkes treated Plaintiff for CML, Plaintiff did talk to him about his back problems and his psychological problems. Clearly, those contemporaneous statements are relevant to whether Plaintiff has disabling pain or psychological difficulties.

---

[12]This new evidence must be considered when determining whether the ALJ's decision is supported by substantial evidence on the record as a whole.  See **Gartman v. Apfel**, 220 F.3d 918, 922 (8th Cir. 2000); **Kitt v. Apfel**, 204 F.3d 785, 786 (8th Cir. 2000).

[13]The Court notes that Dr. Anderson bases his assessment of Plaintiff's trustworthiness, in part, on him keeping appointments, yet the record indicates that Plaintiff did not return in six weeks as instructed.

In addition to arguing that the ALJ did not consider all the medical evidence, Plaintiff further argues that the ALJ improperly weighed the evidence of Dr. Swarm and of Dr. Anderson's diagnosis of Plaintiff with a pain disorder.[14] The ALJ did neither. Although the ALJ referred to only two of Dr. Swarm's medical records, those records are indicative of all Dr. Swarm's records. In his records, Dr. Swarm consistently advocates an alternative method of treatment, renews Plaintiff's prescription for oxycodone, and cautions him about the use of such. This is not inconsistent with the concern of the physician in 2001 about Plaintiff's continuing use of Oxycontin and Percocet. Moreover, Dr. Swarm's records include a reference to him being called after Plaintiff also presented to the pharmacist a prescription for Percocet from another doctor.

Nor did the Appeals Council err in not giving controlling weight to Dr. Anderson's diagnosis of a chronic pain syndrome. He did not render this diagnosis when treating Plaintiff, but gave it ten months after last seeing him. The diagnosis for which he was treating Plaintiff was bipolar affective disorder, a diagnosis which was recognized by the ALJ.

Plaintiff's Credibility. As noted above, when evaluating a claimant's RFC, the ALJ must consider, inter alia, the claimant's own descriptions of his limitations. **Pearsall**, 274 F.3d at 1217. Consequently, the ALJ must evaluate the claimant's credibility. **Id.** at 1218.

_____

[14]In his reply brief, Plaintiff also challenges the ALJ's failure to include some limitations found by Dr. Cottone and the GAF finding of Dr. Lipsitz. The ALJ is not "required to refer to every part of the record[.]" **Roberson**, 481 F.3d at 1026. The ALJ properly incorporated in his assessment of Plaintiff's RFC those findings he found credible.

See also **Dukes v. Barnhart**, 436 F.3d 923, 928 (8th Cir. 2006) (noting that ALJ had to assess claimant's credibility before determining his RFC). "'Where adequately explained and supported, credibility findings are for the ALJ to make.'" **Ellis v. Barnhart**, 392 F.3d 988, 996 (8th Cir. 2005) (quoting Lowe, 226 F.3d at 972). However, "[t]he ALJ need not explicitly discuss each Polaski factor." **Strongson**, 361 F.3d at 1072 (alteration added). "It is sufficient if he acknowledges and considers those factors before discounting a claimant's subjective complaints." **Id.** Accord **Goff v. Barnhart**, 421 F.3d 785, 791-92 (8th Cir. 2005); **Lowe**, 226 F.3d at 972.

In the instant case, after summarizing the medical evidence, the ALJ considered Plaintiff's subjective complaints and discounted them based on several Polaski factors, including the lack of supporting objective evidence, the lack of an opinion by a physician that he was disabled, the lack of an assistive device, and the lack of any restrictions placed on him by a physician. These are proper considerations. See **Gonzales v. Barnhart**, 465 F.3d 890, 895 (8th Cir. 2006) (considering lack of assistive devices when assessing credibility of claimant alleging disabling back pain); **Raney v. Barnhart**, 396 F.3d 1007, 1011 (8th Cir. 2005) (affirming adverse credibility determination by ALJ who emphasized absence of any doctor's opinion that claimant was disabled); **Tucker v. Barnhart**, 363 F.3d 781, 783 (8th Cir. 2004) (finding that ALJ properly questioned credibility determination of claimant whose medical records showed relatively minor degenerative changes and whose physicians did not place any restrictions on him despite allegations of severe pain); **Depover**

**v. Barnhart**, 349 F.3d 563, 567 (8th Cir. 2003) (affirming adverse credibility finding based in part on lack of any opinion by claimant's treating physicians that claimant was disabled).

Additionally, there were inconsistencies in the record. For instance, Plaintiff informed Dr. Field that he had been in a motor vehicle accident that injured his cervical spine; he told other treating physicians that there was no injury to his back. He listed ADD as an impairment; it was his son who had been diagnosed with ADD. He complained of side effects from his medication, e.g., dizziness, weakness, and fatigue, but did not complain to his treating physicians of such effects. See **Zeiler v. Barnhart**, 384 F.3d 932, 936 (8th Cir. 2004) (affirming adverse credibility determination based in part on inconsistency between claimant's assertion that she had problems concentrating because of pain medication but she never complained to her doctors of the side effect). He reportedly did well in aquatic therapy, but eight months later said it did not help. He reported to Dr. Wilkes that his pain was "much improved" with use of the TENS unit, but later stated that it had not helped. See **Tellez v. Barnhart**, 403 F.3d 953, 957 (8th Cir. 2005) (deferring to ALJ's credibility determination in case in which claimant gave inconsistent information to physicians and other health care providers).

As noted by Plaintiff, his description of his limited abilities was twice echoed by his mother. "[A]n ALJ is not required to accept a statement from a witness who will benefit financially from a determination of disability." **Roberson**, 481 F.3d at 1025 (rejecting challenge to ALJ's unexplained failure to consider written statement from claimant's

husband) (alteration added).  Plaintiff lives with his mother; clearly, she would benefit from a favorable decision.

## Conclusion

Plaintiff argues that there is substantial evidence to support a finding that, although his leukemia is medically improved to a degree that it no longer disables him, his back and mental impairments are disabling.  There is also, however, substantial evidence in the record as a whole, including a consideration of the evidence that detracts from the ALJ's decision, to support the ALJ's conclusion that Plaintiff is not disabled within the meaning of the Social Security Act.  This Court may not substitute its decision for that of the Commissioner. Accordingly,

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner be AFFIRMED and that this case be DISMISSED.

The parties are advised that they have eleven (11) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in waiver of the right to appeal questions of fact.  See **Griffini v. Mitchell**, 31 F.3d 690, 692 (8th Cir. 1994).

/s/ Thomas C. Mummert, III

THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this 11th day of July, 2007.